# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CALBERT LEE,

      Plaintiff,

v.                                                              Civ. No. 16-366 SCY/KK

SYLVIA MATHEWS BURWELL, *Secretary*,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

The Gallup Indian Medical Center (GIMC) terminated Plaintiff Calbert Lee from his position as a medical officer one month before the end of his two-year probationary period. Plaintiff alleges that GIMC fired him because he is Native American, and thereby violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Before the Court is Defendant's Motion for Summary Judgment (Doc. 18), filed April 20, 2017, and Plaintiff's Motion to Strike Provisions of Defendant's Statement of Facts in Defendant's summary judgment motion (Doc. 22), filed May 11, 2017.

Having reviewed the motions, briefing, evidence in the summary judgment record, the relevant law, and otherwise being fully advised, the Court concludes that Plaintiff has failed to establish a prima facie case of race-based discrimination and further, even assuming Plaintiff established a prima facie case, Plaintiff has failed to demonstrate that Defendant's proffered reasons for his termination were a pretext for unlawful race-based discrimination. Accordingly, the Court grants Defendant's motion for summary judgment and dismisses this case with prejudice.

## I.     BACKGROUND

Before considering the facts and procedural history relevant to Defendant's summary judgment motion, the Court addresses two preliminary matters: (1) Plaintiff's motion to strike several exhibits Defendant submitted in support of its summary judgment motion (Doc. 22); and (2) factual assertions in Plaintiff's unverified complaint that the Court is considering for purposes of summary judgment.

### a.     __Plaintiff's Motion to Strike (Doc. 22)__[1]

"At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (internal citation omitted). "Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Id.* "Nonetheless, the content or substance of the evidence must be admissible." *Id.* (internal citation and quotation marks omitted). "Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form." *Id.* "The requirement that the substance of the evidence must be

---

[1] Defendant argues that the Court should disregard Plaintiff's motion to strike because it is procedurally improper under Fed. R. Civ. P. 56. Doc. 24. Defendant is correct that, following amendments to Rule 56 in 2010, the proper mechanism for challenging an opposing party's evidence is to make an objection under Rule 56(c)(2) rather than to file a motion to strike. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *see also* Fed. R. Civ. P. 56, 2010 Advisory Committee Notes (stating that there is no need to make a separate motion to strike); 11 *Moore's Federal Practice*, § 56.91[4] (Matthew Bender 3d Ed.) (indicating that after the 2010 amendments to Rule 56, "[a] court should disregard inadmissible evidence instead of striking it from the record, as was done with a formal motion to strike."). Although Defendant's concerns are valid, for the sake of judicial efficiency, the Court will construe Plaintiff's motion as making objections to the defense exhibits. *See* 11 *Moore's Federal Practice*, § 56.91[4] (indicating that courts "seem to be resolving [motions to strike] on the merits rather than rejecting them as procedurally improper"). If the Court determines that Plaintiff's objection to a defense exhibit is valid, the Court will disregard the exhibit as inadmissible evidence rather than strike it from the summary judgment record.

admissible is not only explicit in Rule 56, which provides that '[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence,' Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage." *Id*. "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Id*.

In his motion to strike, Plaintiff seeks to strike sixteen defense exhibits on "grounds of [f]oundation and [h]earsay." *Id*. Plaintiff offers no further explanation besides this statement for each exhibit and it is not the Court's role to develop Plaintiff's argument. Thus, although the Court will address Plaintiff's objections, its analysis will necessarily be limited by Plaintiff's failure to develop his arguments.

First, the Court overrules Plaintiff's foundation and hearsay objections to Dr. Mora's affidavit (Def. Ex. 4). Rule 56(c)(4) requires that an affidavit be made on personal knowledge, show that the affiant is competent, and include facts that would be admissible at trial. Plaintiff's foundation objection is overruled because he has given no reason to doubt that Dr. Mora's affidavit is based on her personal knowledge of Plaintiff's job performance, complaints GIMC received regarding Plaintiff, and the circumstances surrounding his termination. As to Plaintiff's hearsay objection, Plaintiff argues that the following lines in Dr. Mora's affidavit contain inadmissible hearsay: "within the first month of [Plaintiff's] employment we received a patient complaint that he was rude and did not want to talk to the patient's family. We just thought he was new to the facility; so, Dr. Forman sat down and talked with him. Then, we received another complaint from staff in the Emergency Room regarding him being rude to the nurses. Later, we received a complaint from the Operator that he was rude when he yelled at her. Essentially, we just received several complaints from patients, their families, and Agency staff." *See* Mora Aff.

(Doc. 18-1) at 3. Hearsay is defined as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A "statement" is a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). The Court concludes that these lines in Dr. Mora's affidavit do not constitute hearsay because Defendant does not offer them to prove the truth of the matters stated therein (e.g., that Plaintiff was in fact "rude" to staff or patients) but rather for the purpose of establishing that Dr. Mora received complaints about Plaintiff from patients and staff and these complaints, whether ultimately valid or not, constituted a race-neutral reason for terminating Plaintiff. Furthermore, Plaintiff himself characterized these complaints in a manner similar to Dr. Mora. *See* Lee Aff. (Doc. 21-1) at 6-7 ("The operator complained to her supervisor that I was rude"; "the patient's family thought I was being rude and filed a complaint."). Thus, essentially the same evidence Plaintiff seeks to exclude is already in the record elsewhere without objection. For these reasons, the Court overrules Plaintiff's hearsay and foundation objections to Dr. Mora's affidavit.

The Court next considers Plaintiff's foundation and hearsay objections to several defense exhibits consisting of complaints GIMC received regarding Plaintiff (Def. Ex. 9 – 14, 16, 18, 20, 22 – 23); an internal GIMC memorandum providing physician salary information (Def. Ex. 5); a letter of counseling GIMC issued to Plaintiff (Def. Ex. 15); and informal notes/memos Plaintiff's immediate supervisor, Dr. Forman, kept of conversations he had with Plaintiff regarding the complaints (Def. Ex. 19, 21). Defendant contends that several of these exhibits fall within the hearsay exception for business records. Doc. 24 at 6-7. In support of its business record argument, Defendant points out that GIMC kept complaints about Plaintiff in Plaintiff's personnel file. Doc. 24 at 6. Further, Defendant again argues that complaints about Plaintiff do

not constitute hearsay because they are not being offered for the truth, but rather to demonstrate the information Dr. Mora relied on when she decided to terminate Plaintiff. Doc. 24 at 5-6.

"Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are 'kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum [record].'" *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006). To satisfy Rule 803(6), "a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; . . . (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant; and (4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness." *Id*. at 1140-41 (internal quotation marks and citation omitted). "Not every item of business correspondence constitutes a business record. It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business. Moreover, business records are potentially fraught with double hearsay. Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." *Id.* at 1141 (internal quotation marks and citations omitted).

The bulk of Plaintiff's motion to strike consists of foundation and hearsay objections to several defense exhibits consisting of complaints GIMC received regarding Plaintiff (Def. Ex. 9 – 14, 16, 18, 20, 22 – 23). The Court agrees with Defendant that these are business records in the sense that it was GIMC's normal practice to keep patient and staff complaints regarding an employee in the employee's personnel file. Further, the complaints memorialized in these

records do not constitute inadmissible hearsay because they are not being offered for the truth of the matter asserted (i.e., the truth/falsity of each complaint or whether Plaintiff did/said what was alleged in the complaint). Instead, they are being offered to show that the complaints were made, that Dr. Mora and/or Dr. Forman had notice of the complaints at the time they decided to terminate Plaintiff, and that Dr. Mora terminated Plaintiff for a race-neutral reason.

Plaintiff argues that Dr. Mora's basis for relying on the complaints was unsound. This argument, however, does not bear on the admissibility of the evidence. Moreover, if Dr. Mora truly fired Plaintiff because she believed these complaints about Plaintiff's professionalism and demeanor were valid, whether Dr. Mora was reasonable in relying on these complaints is irrelevant. For purposes of the Court's Title VII analysis, it does not matter whether Dr. Mora's decision to terminate Defendant was just. What matters is whether Dr. Mora made her decision based on Plaintiff's race. The Court will consider Defendant's Exhibits 9 - 14, 16, 18, 20, 22 - 23 for the non-hearsay purpose of supporting Defendant's asserted race-neutral reason for terminating Plaintiff.

The Court next agrees with Defendant that GIMC's internal memorandum concerning salary information (Def. Ex. 5) and the letter of counseling GIMC issued to Plaintiff (Def. Ex. 15) are exhibits that fall within the business records exception to the hearsay rule. There is no indication that these two documents do not satisfy Rule 803(6). Thus, the Court overrules Plaintiff's objection as to Defendant's Exhibits 5 and 15.

The admissibility of the final item, Dr. Forman's informal notes of meetings with Plaintiff (Def. Ex. 19, 21), is a closer call because Defendant has not established that Dr. Forman's notes were generated in the normal course of business or that it was GIMC's regular practice to have supervisors such as Dr. Forman take such notes and add the notes to employee

personnel files. The Court does not rely on this evidence in its analysis, however, and so need not rule on the admissibility of Defendant's Exhibits 19 and 21.[2]

In sum, for the reasons set forth above, Plaintiff's motion to strike (Doc. 22) is denied with the exception of Defendant's Exhibits 19 and 21, the admissibility of which is a moot issue in light of the present Order.

**b. <u>Factual Assertions from Plaintiff's Complaint</u>**

In its summary judgment motion, Defendant set forth as undisputed material facts a number of factual assertions taken directly from Plaintiff's unverified complaint. Doc. 18 at ¶¶ 9-10, 13-19, 21-23. Generally, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Fed. R. Civ. P. 56, and if the allegations contained in the verified complaint are not "merely conclusory." *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (internal citations and quotation marks omitted). While the unverified nature of Plaintiff's complaint would typically dictate against its use at the summary judgment stage, Defendant concedes these facts as undisputed for purposes of summary judgment. Because Defendant conceded these facts, Plaintiff did not offer (nor did he have any reason to) other evidence to support these factual assertions. Therefore, with one exception,[3] the Court will consider those facts in Plaintiff's unverified complaint that Defendant has unequivocally conceded as undisputed facts for purposes of summary judgment. *See*

---

[2] To the extent Defendant argues that Exhibits 19 and 21 are not being offered for the truth of their contents, but rather to establish that the meetings were held, the Court observes that it is undisputed by Plaintiff that he had meetings with Dr. Forman regarding his job performance. Thus, Defendant need not rely on these exhibits to establish the existence of these meetings.

[3] As discussed at the hearing, the Court will not consider those facts that Defendant characterized solely as 'allegations' Plaintiff made in his unverified complaint. *See* Doc. 18-1 at 5-6 ("Plaintiff *alleges* [in his complaint] he was told things such as 'what gives you the right, Mr. Critical Care'!"; "Plaintiff *alleges* [in his complaint] he was treated as an outsider, and never included to any of the social events. . .") (emphasis added).

*Stubblefield v. Johnson-Fagg, Inc.*, 379 F.2d 270, 272 (10th Cir. 1967) (explaining that on summary judgment, the "trial court may not disregard facts stipulated to by the parties or require evidence to support them" and that such stipulations are to be regarded as admissions under Fed. R. Civ. P. 56); *Spencer v. Abbott*, 731 F. App'x 731, 737-38 (10th Cir. 2017) (unpublished) (noting that Tenth Circuit precedent prohibits district courts from disregarding intentional factual stipulations or admissions in summary judgment briefs); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1098 (10th Cir. 1991) ("District courts [] are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside.").

Having resolved these preliminary matters, the Court now turns to the relevant factual background and procedural history of this case.

### c. __Factual Background__[4]

On November 7, 2010, Plaintiff began his employment with the United States Department of Health & Human Services as a Medical Officer (Internal Medicine) at the Gallup Indian Medical Center (GIMC), which is within the Navajo Area Indian Health Service. *See* Def. Ex. 1, Ex. 24 (Doc. 18-1). Dr. Bruce Forman, the acting chief of internal medicine at GIMC, hired Plaintiff and served as Plaintiff's first line supervisor throughout his employment. *See* Doc. 18, Defendant's Undisputed Material Facts (hereinafter "Def. UMF") ¶ 3. GIMC Clinical Director, Dr. Paula Mora, and GIMC Acting Chief Executive Officer, Bernie Yazzie, served as Plaintiff's second line and third line supervisors, respectively. Def. UMF ¶¶ 5-6; *see also* Def. Ex. 24.

---

[4] Except as otherwise noted, the following asserted facts are undisputed.

Dr. Mora and Mr. Yazzie are Native American, while Dr. Forman is Caucasian. Def. UMF ¶¶ 4-6. Plaintiff identifies his race as Native American. *See* Compl. (Doc. 1) ¶ 6; Lee Aff., Nov. 14, 2011, Def. Ex. 2, at 2.

Under applicable federal regulations, Plaintiff was subject to a two-year trial period because he was hired for an excepted service position. *See* Def. UMF ¶ 2 (citing 42 C.F.R. § 136.42; 5 C.F.R. § 213.3116(b)(8); 5 C.F.R. § 9901.512(a)(3)); *see also* Doc. 21, Plaintiff's Undisputed Material Facts (hereinafter "Pl. UMF") ¶ 1 (acknowledging Plaintiff had two-year trial period). According to Dr. Mora, GIMC was pleased to hire Plaintiff because he was trained in internal medicine and had completed a critical care fellowship; he was from the local area and spoke Navajo; and he had a "four year obligation payback scholarship which meant we would have him for four years which helps with stability and continuity." *See* Mora Aff., Dec. 5, 2013, Def. Ex. 4, at 3.

On October 5, 2012, approximately one month before the end of the trial period, Plaintiff was terminated from his position for "unacceptable conduct" which made him "not suitable to effectively perform the duties of a Medical Officer." Def. Ex. 24. The events that transpired during Plaintiff's trial period and the circumstances underlying his termination are at issue in this case. Plaintiff claims that GIMC discriminated against him, and ultimately fired him on the basis of his Native American race. Defendant denies this and maintains that GIMC fired Plaintiff based on complaints it received regarding Plaintiff's interactions with patients, staff, and other providers. The parties' differing accounts regarding Plaintiff's employment are set forth below.

### i. *Plaintiff's version of events*

Plaintiff states that, when he was recruited for the Internist position, GIMC expressed an intent to build a hospitalist program and promised him a hospitalist position once the program

and hospitalist position was created. Pl. Aff., Nov. 14, 2013, Pl. Ex. A, at 2 (Doc. 21-1); Def. UMF ¶ 9. Although Plaintiff began his employment as an internist, he also conducted hospitalist care. *Id*. At some unspecified point in his employment, Plaintiff discovered that GIMC hired another physician, Dr. Barrett, who was a Non-native female for the hospitalist position. Def. UMF ¶¶ 10, 12; Lee Dep. 22:5-21 (Pl. Ex. B); Pl. Aff. at 5. Plaintiff did not apply for this hospitalist position because he was not even aware that it had been advertised. Pl. Aff. at 5; Def. UMF ¶ 11.

Plaintiff claims that "immediately after the first three days in the position, [he] was overwhelmed by the work hours." Pl. Aff. at 2. Within the first few months of his employment, Plaintiff expressed concerns regarding his work schedule to his immediate supervisor, Dr. Forman. Pl. Aff. at 3. At one point, Plaintiff reviewed the work schedules for other providers and noted that he was on-call more frequently than the other providers. Pl. Aff. at 3. Plaintiff also indicates that he was treated as an outsider by the Internal Medicine Department. As an example, he asserts that, although the Department held parties for new providers, he did not receive a party and was not invited to these types of parties. Def. UMF ¶ 18-19; *see also* Pl. Interrog. #1 Resp. (Pl. Ex. C). Plaintiff, however, also stated in his deposition that although he was initially included in department events, as the months progressed in his employment, he decided not to attend "as did other providers." Def. UMF ¶ 20; Pl. Dep. 84:20-85:4 (Def. Ex. 6).

Plaintiff further states he was not asked to perform critical care procedures even though he was available to perform these procedures. Def. UMF ¶ 21. Instead, non-Native providers were asked to perform these procedures, and Plaintiff was only reluctantly allowed to assist the non-Native providers if he brought the necessary procedures to the attention of management.

Def. UMF ¶ 22-23. Plaintiff also indicates that his suggestions or questions about procedures were put aside. Def. UMF ¶ 15.

Despite these issues, Plaintiff claims he performed his job well. He points in particular to the fact that he was rated as "fully successful" in his Employee Performance Appraisal for the first year of his trial period (1/26/2011 – 12/31/2011). *See* Pl. Ex. D. Dr. Forman, who appraised Plaintiff, wrote that Plaintiff "does a very good job with the Int. Med. Department, and has been very helpful with the development of the Hospitalist program at GIMC." *Id.*

With regard to his termination, Plaintiff indicates that he was called into a meeting with Dr. Mora in September 2012 during which she informed him "of complaints received by patients and staff." Pl. Aff. at 4. Plaintiff informed Dr. Mora that he and Dr. Forman had already resolved the complaints he was aware of. *Id.* Despite this, Dr. Mora indicated to Plaintiff that he was being considered for termination. *Id.* One or two weeks later, Plaintiff had another meeting with Dr. Mora, Dr. Forman, Dr. Vaughn (GIMC Chief of Staff), and Plaintiff's union steward. *Id.* Plaintiff did not know what the purpose of the meeting was and, when asked, no clear answer was given. *Id.* Subsequently, on October 5, 2012, Plaintiff was issued the letter of termination. *Id.*

ii. *Defendant's version of events*

Shortly after Plaintiff began his employment, Dr. Forman claims that he started receiving complaints regarding Plaintiff's "interactions with staff members, patients, and patient family members." Forman Aff., Nov. 27, 2013, Def. Ex. 3, at 3. According to Dr. Mora and Dr. Forman, the complaints continued throughout Plaintiff's tenure. Forman Aff. at 2; Mora Aff. at 3. In its summary judgment motion, Defendant detailed at length the specifics of the complaints that

GIMC received regarding Plaintiff. *See* Doc. 18 at 7-10. During the first year of Plaintiff's trial

period, GIMC received the following complaints about Plaintiff:

- November 17, 2010: Patient requested another provider because she "didn't like the way [Plaintiff] talked to her. (Def. Ex. 8)

- November 2010: Emergency room staff expressed concerns that Plaintiff was not communicating with them (Def. Ex. 8)

- March 29, 2011: Dr. Ken Stewart emailed Plaintiff's supervisors to discuss an incident where Plaintiff did not help an emergency department provider even though he was the on-call consultant. (Def. Ex. 9).

- October 7, 2011: Registered Nurse Sharon Edison sent an email regarding what she considered to be "unprofessional and disrespectful" conduct by Plaintiff two days earlier when he made several comments to her and nursing students regarding the emergency department (ED) and issues he had with ED providers. (Def. Ex. 10).

- October 7 and 9, 2011: Nurses Isabel Benavides and Shirleen Long each emailed Dr. Stewart to discuss incidents where they believed Plaintiff had acted unprofessionally towards GIMC staff. (Def. Ex. 11 and 12)

- October 20, 2011: GIMC phone operator complained that Plaintiff was "rude" to him when he refused to make a long distance call for Plaintiff and instead asked Plaintiff to use his assigned long distance code (Def. Ex. 13)

- October 26, 2011: GIMC patient advocate, Marlene Taha, wrote a letter describing Plaintiff's October 25, 2011 call to her in which she felt he was talking to her "in a confrontational manner" (Def. Ex. 14)

In the second year of Plaintiff's trial period, GIMC received the following complaints about Plaintiff:

- February 15, 2012: Dr. Forman received a letter from a patient's family raising concerns they had regarding Plaintiff's treatment of the patient, including that they considered his bedside manner to be "detached and brusque and lacking in empathy", and requesting another provider instead of Plaintiff. (Def. Ex. 16)

- March 26, 2012: Nurse Devon McCabe emailed Dr. Forman to complain that Plaintiff had behaved rudely and unprofessionally with a patient's family that day (Def. Ex. 18)

- May 14, 2012: GIMC nursing staff filed a complaint that Plaintiff was outside a patient's room when he observed that a patient was about to fall, but then did not assist the patient (Def. Ex. 20)

- June 12, 2012: Patient's family complained to GIMC patient advocate that Plaintiff did not identify himself to the patient or his family while treating the patient (Def. Ex. 22)

- June 19, 2012: staff complaint that Plaintiff documented a diagnosis in a medical record that was "[v]ery unreadable and sloppy" (Def. Ex. 23)

Dr. Forman states that he met with Plaintiff "regularly to discuss concerns regarding his conduct." Forman Aff. at 3. It appears that Dr. Forman first met with Plaintiff a few weeks into Plaintiff's employment, on November 18, 2010, to discuss a patient's family's complaint as well as emergency staff concerns that Plaintiff was not communicating with them. *See* Def. Ex. 8.[5] On October 26, 2011, Dr. Forman met with Plaintiff to discuss "concerns raised by other staff

---

[5] Although this exhibit consists of Dr. Forman's handwritten notes, Plaintiff did not move to strike this exhibit. *See* Doc. 22.

members regarding rudeness, disrespectful conduct, and unprofessional behavior on [Plaintiff's] part." Def. Ex. 15. In connection with this meeting, Dr. Forman issued a Letter of Counseling to Plaintiff on November 17, 2011. *Id*. Therein, Dr. Forman specified that the Letter of Counseling was based on "conduct issues [], and not based upon [Plaintiff's] work performance which is very good." *Id*. On February 16, 2012, Dr. Forman met with Plaintiff to discuss the February 15, 2012 patient complaint. Def. Ex. 16-17. On March 23, 2012, April 4, 2012, and July 18, 2012, Dr. Forman met with Plaintiff to address issues and complaints concerning Plaintiff. Plaintiff does not dispute that these meetings occurred.

On September 7, 2012, Dr. Mora met with Plaintiff to discuss hospital staff and patient complaints against him, and informed Plaintiff that his conduct was "not acceptable as it put patient safety at risk." Def. UMF ¶ 51. Dr. Mora apprised Plaintiff that he was near consideration for termination and, on October 5, 2012, Dr. Mora ultimately decided to proceed with Plaintiff's termination. Dr. Mora explained that she decided to terminate Plaintiff's employment based on the complaints GIMC received which "began affecting quality patient care, and the professionalism of our staff toward one another." *See* Mora Aff. at 10. Dr. Mora and Dr. Forman deny that Plaintiff's race played a part in the decision to terminate Plaintiff's employment. Def. UMF ¶ 56.

### d. **Procedural History**

On April 29, 2016, Plaintiff initiated this lawsuit against Defendant by filing a two-page complaint seeking relief under Title VII. Doc. 1 ("Compl."). Plaintiff's complaint indisputably sets forth a discriminatory discharge claim -- i.e., that his termination was the result of race-based discrimination in violation of Title VII. *Id.* at ¶¶ 3, 11 ("Plaintiff was discharged as a result

of his race" and "The grounds for Plaintiff's termination were patently false, and were simply a pretext for the discriminatory firing.").

Whether Plaintiff's complaint set forth additional Title VII claims on other grounds was initially less clear. As a result, after noting this ambiguity and in an abundance of caution, Defendant's motion for summary judgment addressed all conceivably pled Title VII claims. Doc. 18 n.2; *see also id*. at 22.; Doc. 23 at 8. Plaintiff limited his response, however, to the discriminatory discharge claim. Subsequently, at the September 17, 2018 hearing on this motion, Plaintiff confirmed that the only claim he asserts in this lawsuit is a discriminatory discharge claim and that this is the only claim he administratively exhausted. Tr. at 20-21 (Doc. 37). Therefore, the Court construes Plaintiff's complaint as raising a single claim under Title VII for discriminatory discharge on the basis of race. The Court now proceeds to address whether summary judgment is proper as to this claim.

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th

Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## III. ANALYSIS

Under Title VII, it is an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a Title VII race-discrimination claim by either direct or circumstantial evidence. *See Drury v. BNSF Ry. Co.*, 657 F. App'x 785, 789 (10th Cir. 2016) (unpublished)[6]; *see Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons. Evidence of discrimination, if believed, is only direct evidence if it proves the existence of a fact in issue without inference or presumption." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (internal citations and quotation marks omitted). When a Title VII plaintiff relies on indirect or circumstantial evidence, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fassbender*, 890 F.3d at 884.

---

[6] The Court relies upon *Drury* and other unpublished opinions in ruling on Defendant's motion for summary judgment. The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. *See* 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

In this case, the parties agree that the *McDonnell Douglas* framework is applicable to Plaintiff's discriminatory discharge claim.[7] Under this familiar three-step framework, Plaintiff must first establish a prima facie case of discrimination. *Id.* This requires Plaintiff to demonstrate that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *See EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007). If Plaintiff establishes a prima facie case, the burden shifts "to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005); *see also Young v. City of Idabel*, 721 F. App'x 789, 795 (10th Cir. 2018) (unpublished). If the defendant-employer carries its burden of production, the burden then shifts back to Plaintiff to show that the employer's reasons are a pretext for unlawful discrimination. *See Jaramillo*, 427 F.3d at 1307; *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011).

1. <u>Plaintiff fails to establish a prima facie case</u>

Defendant does not dispute that Plaintiff is a member of a protected class by virtue of his Native American race and that Plaintiff's termination constitutes an adverse employment action. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) (for Title VII discrimination claims, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (internal citation and emphasis omitted). Consequently, the Court only considers whether Plaintiff meets the third

---

[7] Although Plaintiff does not expressly state in his response brief that he is relying on circumstantial evidence of discrimination, he indicates that the appropriate analysis of his Title VII claim is under the three-part *McDonnell Douglas* framework. *See* Doc. 21 at 10.

element of a prima facie case, which is the "critical prima facie inquiry; i.e., inference of discrimination." *Laul v. Los Alamos Nat'l Laboratories*, 714 F. App'x 832, 836 (10th Cir. 2017) (unpublished). Defendant argues that it is entitled to summary judgment because Plaintiff is unable to demonstrate that his termination occurred under circumstances which gave rise to an inference of discrimination.

"The burden of production placed on the plaintiff relative to the inference of discrimination element . . . is not onerous." *See Lincoln v. BNSF Ry. Co.*, ___ F.3d ___, 2018 WL 3945875, at *15 (10th Cir. 2018). "Under this inquiry, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *Laul*, 714 F. App'x at 836 (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). "Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). These include "(1) 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus,' (2) 'preferential treatment given to employees outside the protected class,' (3) 'a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified],' and (4) a 'failure to surface plaintiff's name for positions for which she is well-qualified.'" *Lincoln*, 2018 WL 3945875, at *15 (quoting *Plotke*, 405 F.3d at 1101 (10th Cir. 2005)). A plaintiff may also rely "upon the timing or sequence of events leading to [her] termination." *Plotke*, 405 F.3d at 1101 (internal citation omitted). A plaintiff can also "demonstrate an inference of discrimination is to show that the employer treated similarly situated employees more favorably." *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).

In its summary judgment motion, Defendant frames the question of whether Plaintiff has demonstrated an inference of discrimination primarily in terms of whether Plaintiff can show that

Defendant treated similarly situated employees more favorably. *See* Doc. 18 at 13. The Tenth Circuit states that "[s]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007). Defendant specifically contends that Plaintiff fails at the third prong of the prima facie case because he "cannot identify any other employee with such a lengthy record of patient, staff, and family complaints who was not terminated." *See* Doc. 18 at 15; *see also* Doc. 23 at 7 (arguing Plaintiff "failed to identify any other probationary employees who were allowed to continue their employment despite similar conduct issues").

The Court agrees with Defendant that Plaintiff has not identified similarly situated employees who were treated more favorably. Plaintiff broadly asserts in his response brief that the similarly situated employees are "the non-Native medical providers employed by Defendant." Doc. 21 at 11. This cursory assertion lacks the degree of specificity necessary for Plaintiff to demonstrate that similarly situated employees were treated more favorably. Plaintiff neither identifies these "non-Native medical providers" nor points to any evidence in the summary judgment record showing that these unnamed employees dealt with the same supervisor, were subject to the same evaluation standards, had similar responsibilities or were in any other way similarly situated. *See also McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir.2006) (individuals are considered "similarly-situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness").

The Court acknowledges that elsewhere in his briefing, Plaintiff identified two providers, Dr. Fralinger and Dr. Barrett, who he alleges were treated more favorably than he was. *See* Doc.

21 at 4 (Dr. Fralinger "would have outbursts with cursing, yelling and screaming at the nursing staff" but was "not terminated or reprimanded for this behavior"; Dr. Barrett "was treated with favoritism."). Plaintiff, however, failed to provide any evidence regarding Dr. Fralinger and Dr. Barrett's employment; critically, Plaintiff does not argue that these providers were similarly situated to him based on their positions, their supervisors, or by virtue of being subject to the same standards governing performance or discipline.[8] Plaintiff is therefore unable to establish that these two providers were similarly situated in material respects and that they were treated more favorably than he was. Because Plaintiff has not demonstrated that similarly situated employees were treated more favorably, he cannot meet the third prong of the prima facie case on this basis.

Of course, while an inference of discrimination "may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *See Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir. 2005). None of the other grounds Plaintiff points to in his response brief, however, are sufficient to establish an inference of discrimination. *See* Doc. 21 at 11-12.

---

[8] Furthermore, Defendant is correct that Plaintiff failed to properly support his allegations that Dr. Barrett was treated with favoritism or that Dr. Fralinger was not terminated or reprimanded for outbursts. *See* Doc. 23 at 4. It is well-established that "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Here, the only support Plaintiff offers for these assertions are his own responses to written discovery requests, which the Court concludes are nothing more than unsubstantiated allegations carrying no probative weight. *Id.* ("unsubstantiated allegations carry no probative weight in summary judgment proceedings"). In sum, Plaintiff cannot establish a prima facie case by merely alleging, without any evidence to substantiate his allegations, that Dr. Barrett was treated more favorably or that Dr. Fralinger escaped discipline for similar misconduct.

For example, Plaintiff asserts that, because he is Native American, he was subject to a two-year trial period while non-Native providers were subject to only a one-year trial period. *See* Doc. 21 at 11. Plaintiff does not dispute, however, Defendant's evidence that GIMC hired him for an excepted service position and that federal regulations governing such an appointment mandated a two-year trial period. Significantly, Plaintiff also does not allege that Defendant, in hiring Plaintiff for this excepted service position and in requiring a two-year trial period, did anything but follow the applicable federal regulations. Plaintiff cannot establish an inference of discrimination merely because Defendant imposed the legally mandated trial period for the excepted service position for which Plaintiff applied and then received.

Plaintiff next asserts that an inference of discrimination arises because he was paid less than a similarly qualified non-Native hire. Doc. 21 at 11. The evidence Plaintiff relies on to support this assertion, however, is not clear. Defendant did present an exhibit providing salary information. But, rather than endorsing this evidence, Plaintiff seeks to exclude it as inadmissible hearsay. Moreover, during the hearing on Defendant's motion for summary judgment, Plaintiff acknowledged that the evidence Plaintiff himself relies on (what he heard other people earned) is inadmissible hearsay. *See* Tr. at 25 (agreeing that Plaintiff's knowledge of salary differences was acquired by hearsay); *See* Doc. 22 (seeking to strike Def. Ex. 5 (email providing salary information) on hearsay and foundation grounds).

Assuming Defendant's exhibit of salary information was admissible as a business record, however, the pay differential would not establish an inference of discrimination. Specifically, Defendant provided salary information for five internal medicine providers, including Plaintiff, who were hired during the same time period. *See* Def. Ex. 5. Of these providers, Plaintiff was the second highest paid. *Id.* As to the one provider hired at a higher salary, Defendant asserts she

was paid more because she had an advanced degree in public health and six years of practice experience after completing her residency. *Id*. There is no evidence in the record that Plaintiff had a similar advanced degree or years of experience equivalent to that of the higher-paid provider. Given the existence of non-discriminatory reasons for the one provider to be paid more than Plaintiff, and the fact that Plaintiff was paid more than the remaining three providers, evidence of a pay differential contained in Defendant's exhibit is insufficient to create an inference of discrimination. And, Plaintiff has not pointed to any evidence regarding the basis for the pay difference from which an inference of discriminatory intent could be made.

Plaintiff also contends that an inference of discrimination arises because he was given a less desirable work schedule than non-Native medical providers. Doc. 21 at 11. Plaintiff, however, relies solely upon self-serving evidence consisting of his own affidavit or deposition testimony to support this assertion. On the other hand, Defendant has presented actual evidence disputing Plaintiff's assertions regarding work schedules. This evidence shows that for a particular time period, Plaintiff took more leave than any other listed provider and did not take any day or night calls. *See* Doc. 18 at 7. Although the evidence does not cover the entire length of Plaintiff's employment, it is probative because Plaintiff did not submit any evidence supporting his argument that non-Native providers were given better work schedules.

Plaintiff also argues that Defendant's reluctance in allowing him to complete critical care procedures in favor of non-Native medical providers and the fact that his procedural suggestions were set aside in lieu of suggestions made by non-Natives both give rise to an inference of discrimination.[9] Doc. 21 at 11-12. Plaintiff, however, does not establish the significance of

---

[9] Plaintiff does not present any actual examples of this occurring. However, this can reasonably be explained by the fact that Defendant conceded these assertions to be undisputed facts for purposes of its summary judgment motion.

performing critical care procedures or of offering suggestions regarding procedures on GIMC's retention/termination decisions for trial-period employees. Plaintiff also does not suggest that GIMC completely prohibited him from performing critical care procedures but, instead, that GIMC only "reluctantly" allowed him to perform them. Thus, Plaintiff has not connected the slights he claims GIMC levied on him to his allegations that GIMC fired him for discriminatory reasons. *See Adamson v Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008) (stating that evidence "tending to cast doubt on an employer's stated reasons for an employment decision" does not always satisfy the "burden of establishing an inference of actionable discriminatory animus [at the prima facie stage]", and that a plaintiff hoping to prove his prima facie case by attacking the employer's reason for his termination must still show a "demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent".).

In sum, Plaintiff has not established a prima facie case because he has not demonstrated that his termination took place under circumstances giving rise to an inference of discrimination. Therefore, Defendant is entitled to summary judgment on this basis. *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, his entire case fails.").

2. <u>In the alternative, even assuming a prima facie case was established, Plaintiff has failed to demonstrate that Defendant's proffered reasons for his termination were a pretext for unlawful race-based discrimination</u>

As stated earlier, if a plaintiff establishes a prima facie case, the Court next considers "whether [Defendant has] produced a legitimate, nondiscriminatory reason for its employment decision and, if so, whether [Plaintiff has] produced evidence sufficient to raise a genuine issue of material fact on the question of pretext." *Jaramillo*, 427 F.3d at 1307. In this case, the Court

finds that Defendant has proffered a legitimate, nondiscriminatory reason for terminating

Plaintiff's employment, but that Plaintiff has failed to show evidence sufficient to raise a genuine

issue of material fact on the question of pretext.

     *a. Legitimate, Nondiscriminatory Reason for Termination*

  At the second stage of the *McDonnell Douglas* framework, Defendant must articulate a

legitimate, nondiscriminatory reason for terminating Plaintiff. At this stage, Defendant is

required only to "explain its actions against the plaintiff in terms that are not facially prohibited

by Title VII." *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). Defendant does not

"need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon

was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory

fashion." *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir. 1992). Rather, Defendant's

"burden at this stage is one of production, not one of persuasion." *EEOC v. Horizon/CMS*

*Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

  Here, the October 5, 2012 termination letter Plaintiff received indicates that Defendant

terminated his employment on the basis of "unacceptable conduct" which made him "not

suitable to effectively perform the duties of a Medical Officer." Def. Ex. 24. Although the letter

did not elaborate on what this unacceptable conduct was, Dr. Mora explained that the decision to

terminate Plaintiff was based on complaints GIMC received from patients, staff, and other

medical providers regarding Plaintiff's behavior that began "affecting quality patient care, and

the professionalism among our staff toward one another." *See* Mora Aff. at 10. Plaintiff's

immediate supervisor, Dr. Forman, similarly indicated that the termination decision was based

on complaints regarding Plaintiff's behavior and/or conduct during his interactions with staff

members, patients, and patient family members. *See* Forman Aff. at 3. According to Dr. Forman, Plaintiff's "unprofessional behavior and disrespectful conduct" led to his termination. *Id.*

Although Plaintiff argues that the complaints GIMC received were "only a pretext for discriminatory firing", *see* Doc. 21 at 9, he does not otherwise contend that Defendant's proffered explanation is "facially prohibited by Title VII." *Jones*, 349 F.3d at 1266. The Court therefore concludes that Defendant has articulated a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment. *See, e.g., Plotke*, 405 F.3d 1092, 1102 (employer's proffered reason for discharging plaintiff due to unsatisfactory conduct was adequate to meet second step of *McDonnell Douglas* analysis).

### b. Pretext

An employee can demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted). Pretext can be shown in a number of ways, including for example, by presenting "evidence that [the] defendant's stated reason for the adverse employment action was false"; by presenting evidence that "the defendant acted contrary to a written company policy proscribing the action taken by the defendant under the circumstances"; or by presenting evidence that "he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004). "Evidence that the employer should not have made the termination decision--for example, that the employer was mistaken or used poor business judgment--is not sufficient to show that the employer's explanation is unworthy of

credibility." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970-71 (10th Cir. 2017) (internal citation and quotation marks omitted).

In deciding if a plaintiff has made a sufficient showing of pretext, the court "must consider the evidence as a whole." *Danville,* 292 F.3d at 1250. Mere allegations are insufficient, *Morgan,* 108 F.3d at 1324, and "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment," *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*, and do not look to the plaintiff's subjective evaluation of the situation." *DePaula*, 858 F.3d at 971. At the summary judgment stage, the plaintiff's own conclusory opinions about his qualifications and about the employer's motives do not give rise to a material factual dispute. *Bullington v. United Air Lines,* 186 F.3d 1301, 1318 (10th Cir. 1999). The pertinent inquiry at this stage does not focus on whether the employer's "proffered reasons were wise, fair or correct," but looks at whether the employer "honestly believed those reasons and acted in good faith on that belief." *Id.* (citation omitted).

Here, Plaintiff makes two pretext arguments challenging Defendant's reason for his termination. First, Plaintiff states that the Court can infer pretext from the fact that his 2011 annual performance appraisal plan rated his work performance as "fully successful" and did not mention any of the complaints Defendant claims served as its basis for terminating Plaintiff. *See* Pl. Ex. D; Doc. 21 at 12-13. Plaintiff contends that "if these 'complaints' [were] so bad that they justif[ied] the termination, surely they deserved some mention in his [performance appraisal plan." Doc. 21 at 13. Second, Plaintiff asserts that "surely" another provider, Dr. Fralinger, had

complaints in his file regarding his outbursts with staff but he was not fired or otherwise reprimanded for such conduct. Doc. 21 at 13.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff's 2011 performance appraisal is not sufficient to create a genuine issue of material fact regarding pretext. When viewed in isolation, the appraisal does lend support to Plaintiff's argument that Defendant's stated reason for terminating him was false. That is, despite the undisputed evidence of complaints regarding Plaintiff's interactions with others in 2011, GIMC's failure to mention these issues in the 2011 appraisal supports the notion that Defendant was in fact not concerned about Plaintiff's interactions with others. At a minimum, the appraisal shows that the documented 2011 complaints were not enough to merit termination. Had they been enough, GIMC would not have given Plaintiff a "fully successful" appraisal, specifying therein that Plaintiff "treats others with respect; fosters a cooperative environment . . .", that he exceeds expectations with regard to patient care; and that he is fully successful in performing "duties in a courteous and culturally sensitive matter." *See* Pl. Ex. D. Thus, if there were no other documented issues or complaints regarding Plaintiff after the date of the appraisal, the 2011 appraisal might be sufficient to raise genuine issues of fact regarding pretext.

However, that is not the case here. The undisputed evidence shows that Defendant continued to receive complaints regarding Plaintiff's interactions with patients and staff in 2012. Plaintiff's 2011 appraisal does not bear on that evidence and cannot be considered in isolation because the court "must consider the evidence as a whole" when it conducts the pretext inquiry. *See Danville,* 292 F.3d at 1250. The 2011 appraisal does not refute the fact that GIMC relied on the 2011 and the 2012 complaints in its decision to terminate Plaintiff. *See Stewart v. Oklahoma ex rel. Oklahoma Office of Juvenile Affairs*, 587 F. App'x 455 (10th Cir. 2014) (employee's

positive performance review, which was issued several weeks after the first of three incidents that led to employee's discharge, was insufficient to raise an inference of pretext because employer's stated reason for the discharge was the cumulative effect of all three incidents).

Lastly, Plaintiff merely speculates that Dr. Fralinger had complaints for similar misconduct but was not reprimanded. He does not point to any evidence, beyond his speculations, that this was the case, which is not adequate to survive summary judgment.

Thus, Plaintiff's failure to meet his burden to produce evidence that the reason for his termination was a pretext for discrimination is an alternate basis for granting summary judgment in favor of Defendant.

## IV.  CONCLUSION

Because Plaintiff has failed to establish a prima facie case of discrimination under Title VII and, even if he could, Plaintiff cannot establish that Defendant's stated reasons for terminating Plaintiff were pretextual, the Court grants Defendant's motion for summary judgment (Doc. 18) and dismisses this lawsuit with prejudice.

**IT IS SO ORDERED**.

UNITED STATES MAGISTRATE JUDGE
Presiding by Consent